*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

LEONDIUS DERRICK KIRKSEY,

Defendant-Appellant.

UNPUBLISHED
October 23, 2025
10:12 AM

No. 370287
Oakland Circuit Court
LC No. 2023-284332-FC

Before: GADOLA, C.J., and MURRAY and YATES, JJ.

PER CURIAM.

Defendant appeals as of right his jury-trial convictions of armed robbery, MCL 750.529, first-degree home invasion, MCL 750.110a(2), and unlawful imprisonment, MCL 750.349b. Defendant was sentenced, as a fourth-offense habitual offender, MCL 769.12, to concurrent terms of 40 to 80 years' imprisonment for each conviction. We affirm.

## I. FACTS

This case arises out of an armed robbery and home invasion on June 1, 2021, at an apartment in Farmington Hills. Brooke Maher testified that early that morning she was sleeping in the bedroom of her apartment, and her one-year-old daughter was sleeping in a crib in the same room. At approximately 6:00 a.m., Maher awoke when she heard an unfamiliar voice in her apartment. When she sat up, she saw a man standing between her bed and her child's crib pointing a gun at her. According to Maher, the gunman was a black male wearing black sweat pants, a black hooded sweatshirt with the hood up, a black ski mask covering his face, and black shoes with a white symbol on them that looked like the Nike "swoosh" logo.

The gunman told her she was being robbed, then tied Maher with a rope, put her in the bedroom closet, and closed the door. Maher testified that she was frightened because her baby, now awake, was alone in the bedroom with the gunman. When she attempted to open the closet door a bit to enable her to see the baby, the gunman threatened that something bad would happen if she did not stay still. He told her that he had her debit card, demanded the Personal Identification Number (PIN) for the debit card, and threatened that he would hurt her if she gave him an incorrect

number. The gunman asked her how much money was in her bank account, and she told him approximately $100.

Maher testified that the gunman had a cell phone and appeared to be talking to someone during the robbery. He then searched her apartment for valuables, returning to the closet occasionally to threaten that he would hurt her if she moved. The gunman continued to hold the gun in his hand throughout the robbery. The gunman also took her cell phone from her nightstand; the police later found Maher's cell phone hidden under the couch cushions in the living room of the apartment. The gunman then left, telling Maher to count to 100 before attempting to free herself. After the man left, Maher untied herself and ran out of her apartment with her daughter. She went to another resident's apartment and called the police.

Farmington Hills Police Department (FHPD) responded. Maher reported the home invasion and also that her purse, along with her debit card, now was missing. The officers collected the rope that was used to tie Maher. The officers also contacted Maher's bank and learned that someone had attempted to use Maher's debit card that morning at an automated teller machine (ATM) at a Sunoco gas station on Eight Mile Road in Southfield at 6:08 a.m., at a British Petroleum (BP) gas station across the street from Maher's apartment at 6:59 a.m., and at a Sunoco gas station on Farmington Road a few minutes from Maher's apartment at 7:11 a.m. Police obtained the security camera footage from the three gas stations. Video from the Southfield Sunoco and the BP gas station shows a man wearing clothing consistent with the description given by Maher, driving a red Ford Flex, and attempting to use the ATM at the approximate times given by Maher's bank. Video from the Farmington Sunoco depicts the same man arriving at the gas station, walking in the direction of the ATM, and shortly thereafter walking out of the gas station. Less than a minute later, a red Ford Flex is seen leaving the parking lot.

FHPD put out a bulletin to law enforcement with a description of the perpetrator and received information identifying defendant as a suspect; the Michigan Secretary of State database revealed that defendant owned a red Ford Flex. Police thereafter pulled defendant over while he was driving a rented white BMW. During the traffic stop, officers saw a shoe in the back seat of the BMW that matched the shoes the suspect was wearing on June 1, 2021. Defendant admitted to police that he owned a red Ford Flex; when police located defendant's red Ford Flex, they discovered a shoe box for black and white Nike shoes in the car.

At trial, the prosecution introduced the testimony of a forensic scientist qualified by the trial court as an expert in forensic biology and DNA analysis. She testified that her analysis of the DNA obtained from the rope used to tie Maher revealed DNA from four individuals, one of whom was Maher. Of the remaining three DNA contributors, the test results strongly suggested that one of the contributors of DNA was defendant. She opined that it was 16 billon times more likely that the DNA in question from the rope originated from defendant than from an unrelated, unknown contributor. The forensic scientist explained that the analysis provided very strong support that defendant's DNA was present on the rope.

The jury found defendant guilty of armed robbery, first-degree home invasion, and unlawful imprisonment. Defendant was sentenced as indicated, and this appeal followed.

## II. DISCUSSION

A. SUFFICIENCY OF EVIDENCE

Defendant contends that the evidence presented at trial was insufficient to identify him as the perpetrator of the crimes, and that as a result his convictions violate his right to due process. We disagree.

We review de novo a challenge to the sufficiency of the evidence. *People v Montague*, 338 Mich App 29, 44; 979 NW2d 406 (2021). In doing so, we view the evidence in a light most favorable to the prosecution to determine whether any trier of fact could find that the essential elements of the offense were proven beyond a reasonable doubt. *People v Xun Wang*, 505 Mich 239, 250; 952 NW2d 334 (2020). The standard we apply is deferential; we are required to "draw all reasonable inferences and make all credibility choices in support of the jury verdict." *People v Oros*, 502 Mich 229, 239; 917 NW2d 559 (2018).

The Fifth Amendment of the United States Constitution provides that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law . . . ." US Const, Am V. The Fourteenth Amendment of the United States Constitution further provides, "nor shall any State deprive any person of life, liberty, or property, without due process of law . . . ." US Const, Am XIV. "Due process requires that a prosecutor introduce evidence sufficient to justify a trier of fact to conclude that the defendant is guilty beyond a reasonable doubt." *People v Parkinson*, 348 Mich App 565, 575; 19 NW3d 174 (2023) (quotation marks and citation omitted).

Defendant in this case was convicted of armed robbery, first-degree home invasion, and unlawful imprisonment. A person is guilty of armed robbery if, in the course of committing a robbery, he or she "[p]ossesses a dangerous weapon." MCL 750.529(1)(a). A person is guilty of first-degree home invasion if the person enters a dwelling without permission and commits a felony while "[t]he person is armed with a dangerous weapon," or while "[a]nother person is lawfully present in the dwelling." MCL 750.110a(2). A person is guilty of unlawful imprisonment if the person knowingly restrains another person with a weapon, secretly confines another person, or restrains another person to aid in committing another felony or to flee after the commission of another felony. MCL 750.349b(1). In addition, identity is an element of every criminal offense. *People v Yost*, 278 Mich App 341, 356; 749 NW2d 753 (2008).

Here, defendant does not challenge that the prosecution proved that the charged offenses occurred; rather, defendant challenges only whether the prosecution proved beyond a reasonable doubt that he was the perpetrator of the offenses. The elements of a crime may be sufficiently proven with circumstantial evidence and reasonable inferences arising from that evidence. *Oros*, 502 Mich at 239. Reasonable inferences arising from circumstantial evidence can be sufficient to prove identity, even when the identity evidence "requires reliance on an inference founded on an inference." *People v Bass*, 317 Mich App 241, 264; 893 NW2d 140 (2016). It is the duty of the factfinder to "determine what inferences may be fairly drawn from the evidence and to determine the weight to be accorded those inferences." *People v Hardiman*, 466 Mich 417, 428; 646 NW2d 158 (2002).

Viewing the evidence in this case in the light most favorable to the prosecution, and drawing all inferences and credibility choices in favor of the jury verdict, we conclude that there was sufficient evidence for a rational fact-finder to conclude that defendant was the perpetrator of

the charged offenses. Maher's testimony established that early in the morning on June 1, 2021, a man entered her apartment wearing black pants, black hooded shirt, black ski mask, and black Nike tennis shoes with a white "swoosh." The man threatened her with a gun, demanded the PIN to her debit card, tied her with a rope, put her in the closet, and threatened to harm her if she moved. After he left, she discovered that her purse and her debit card were missing.

The record also demonstrates that on the morning of June 1, 2021, a man attempted to use Maher's debit card to withdraw money from ATMs at three locations. According to the bank records together with the gas stations' security video footage, at 6:08 a.m.,[1] a man wearing clothing consistent with the description given by Maher attempted to withdraw money using Maher's debit card and an invalid PIN from an ATM inside the Southfield Sunoco gas station, located at 23640 West Eight Mile Road, about 5 to 12 minutes from Maher's apartment. At 6:59 a.m., the same man attempted two transactions from an ATM using Maher's debit card at the BP gas station across the road from Maher's apartment; the correct PIN was entered, but the transactions were unsuccessful because the account lacked sufficient funds. At 7:11 a.m. and 7:12 a.m., the same man attempted to withdraw money from an ATM using Maher's debit card at the Farmington Sunoco gas station, located at 22063 Farmington Road, approximately 5 to 10 minutes away from the BP station, but was unable to do so because the account lacked sufficient funds.

The security footage from the gas stations shows that the man attempting to use Maher's debit card was driving a red Ford Flex. Although police later stopped defendant while he was driving a rented white BMW, defendant admitted that he owned a red Ford Flex. In addition, when defendant was stopped in the white BMW, police discovered a black and white Nike shoe in the back seat consistent with the shoes worn by the man in the security camera footage. When defendant's red Ford Flex was located, there was a shoe box in the car for a pair of black and white Nike shoes. Moreover, DNA testing of the rope that was used to tie Maher strongly indicated that defendant's DNA was present on the rope. The evidence viewed as a whole and in the light most favorable to the prosecution was sufficient to establish defendant's identity as the perpetrator. We conclude that a rational trier of fact could conclude beyond a reasonable doubt that defendant was the perpetrator of the charged offenses.

B. REASONABLENESS OF SENTENCE

Defendant contends that his sentences of 40 to 80 years' imprisonment for his convictions are unreasonable and disproportionate. We disagree.

We review a trial court's sentencing decision for an abuse of discretion. *People v Boykin*, 510 Mich 171, 182; 987 NW2d 58 (2022). In the context of sentencing, the trial court abuses its discretion if a sentence violates the principle of proportionality. *People v Dixon-Bey*, 340 Mich

---

[1] Maher testified that she became aware of the man in her apartment at approximately 6:00 a.m. that morning. The prosecution suggests that defendant entered Maher's apartment earlier and stole her purse, which contained her debit card. After trying without success to use the debit card at the Southfield Sunoco, he returned to her apartment, woke Maher, and demanded the PIN for her debit card at gunpoint.

App 292, 296; 985 NW2d 904 (2022). The principle of proportionality requires the sentence to be proportionate to the seriousness of the circumstances surrounding the offense and the offender, *People v Steanhouse*, 500 Mich 453, 459-460; 902 NW2d 327 (2017), rather than according to the relationship of the sentence to the guidelines. *People v Posey*, 512 Mich 317, 356; 1 NW3d 101 (2023) (opinion by BOLDEN, J.).

Michigan's sentencing guidelines are now advisory only; trial courts, however, are required to consult the guidelines and take them into account during sentencing. *People v Lockridge*, 498 Mich 358, 391; 870 NW2d 502 (2015). Although a sentence that falls within a defendant's sentencing guidelines may be challenged for reasonableness, a within-guidelines sentence is presumed to be proportionate, and the defendant challenging the sentence bears the burden of rebutting that presumption. *Posey*, 512 Mich at 360. A sentence is unreasonable, and therefore an abuse of discretion, when the trial court imposes a sentence that does not comply with the principle of proportionality. *People v Lampe*, 327 Mich App 104, 125; 933 NW2d 314 (2019). To rebut the presumption that a sentence is proportionate, the defendant must present unusual circumstances that render the sentence disproportionate. *People v Burkett*, 337 Mich App 631, 637; 976 NW2d 864 (2021). "An appropriate sentence should give consideration to the reformation of the offender, the protection of society, the discipline of the offender, and the deterrence of others from committing the same offense." *Boykin*, 510 Mich at 183.

In this case, under the sentencing guidelines defendant's minimum sentence range was calculated at 225 to 750 months (18.75 to 62.5 years). The trial court sentenced defendant to three concurrent sentences of 40 to 80 years; defendant's minimum sentence thus is within the guidelines and therefore presumptively proportionate. At the time of the offenses in this case, defendant was on parole for four prior convictions for home invasion.[2] In addition, defendant also was facing charges arising from two home invasions that occurred the week after the offenses in this case were committed, one of which involved the home of an FBI agent. Defendant's history of home invasions involved defendant entering occupied apartments through unlocked sliding glass doors, and once inside, taking purses and wallets containing credit cards, and thereafter using the credit cards. Defendant was paroled in 2011 while serving sentences for home invasions for which he was convicted in 2009, incarcerated again for home invasions in 2014, and paroled again in December 2020 before committing the offenses in this case on June 1, 2021. Defendant's presentence investigation report summarized that defendant has been under the supervision of the Michigan Department of Corrections since 2008, had continued to involve himself in criminal behavior since that time, and therefore is a danger to the community.

Defendant argues that the minimum sentence is unreasonable because the offense was not serious enough to justify the penalty, and insufficient identification evidence was presented at trial. We disagree. We note initially that the guidelines in this case, which serve as guidance, are based not only upon the offense, but also upon the history of the offender. Defendant's six prior felonies and his six prior misdemeanors informed the calculation of the guidelines, which in turn advised a minimum sentence range of 18.75 years to 62.5 years. We also note that because of defendant's

---

[2] Defendant is required to serve the sentences consecutively to the sentences for which he was on parole at the time he committed the offenses in this case. See MCL 768.7a(2).

status as an habitual felony offender, MCL 769.12(1)(a) required a minimum sentence of at least 25 years. This Court has held that sentences imposed under habitual offender statutes are not cruel and unusual because the state has the right to protect society from people who repeatedly engage in criminal activity. *Burkett*, 337 Mich App at 637.

With regard to the offense, the evidence at trial established that defendant broke into Maher's apartment while she was sleeping and held her at gunpoint in front of her one-year-old daughter, who was awake. Defendant tied Maher with a rope and put her in the closet where she could not see the child, told Maher that something bad was going to happen if she moved, took her purse and her debit card, and threatened to hurt her if she gave him an incorrect PIN for her debit card. Surveillance video shows a man attempting to use Maher's debit card at three gas stations near Maher's apartment on the morning of the robbery, dressed as described by Maher. After the first attempt, the man using the debit card had the PIN number for the debit card and was able to access Maher's account. The man attempting to use the debit card was driving a red Ford Flex, such as the one defendant owned, and wearing shoes like the shoe and shoebox found in defendant's possession a few days later. In addition, defendant's DNA was found on the rope the gunman used to tie Maher.

When sentencing defendant, the trial court considered the potential danger that defendant posed to Maher and her daughter. The trial court also considered that rehabilitation for defendant was unlikely because at the time the crimes were committed, defendant was on parole for committing identical crimes and had similar charges pending in another jurisdiction. We conclude that defendant's sentences are proportionate to the seriousness of the circumstances and the characteristics of the offense and the offender, and therefore are reasonable. *Steanhouse*, 500 Mich 453 at 471. Accordingly, the trial court did not abuse its discretion when it sentenced defendant to 40 to 80 years' imprisonment.

## C. CRUEL OR UNUSUAL PUNISHMENT

Defendant also contends that his sentences constitute cruel or unusual punishment under Michigan's Constitution and cruel and unusual punishment under the Eighth Amendment of the United States Constitution because he will be at least 76 years old when his minimum sentences are completed. We disagree that the sentences are cruel or unusual.

We review an unpreserved constitutional issue such as this one for "plain error affecting substantial rights." *Burkett*, 337 Mich App at 635 (quotation marks and citation omitted). "To establish entitlement to relief under plain-error review, the defendant must establish that an error occurred, that the error was plain, i.e., clear or obvious, and that the plain error affected substantial rights," meaning that the error affected the outcome of the lower court proceedings. *Lockridge*, 498 Mich at 392-393. In addition, "[r]eversal is warranted only when the plain, forfeited error resulted in the conviction of an actually innocent defendant or when an error seriously affected the fairness, integrity or public reputation of judicial proceedings independent of the defendant's innocence." *People v Randolph*, 502 Mich 1, 10; 917 NW2d 249 (2018).

While the United States Constitution prohibits cruel *and* unusual punishment, US Const, Am VIII, the Michigan Constitution prohibits cruel *or* unusual punishment, Const 1963, art 1, § 16. *People v Stovall*, 510 Mich 301, 313-314; 987 NW2d 85 (2022). As a result, "[i]f a

punishment passes muster under the state constitution, then it necessarily passes muster under the federal constitution." *People v Costner*, 309 Mich App 220, 232; 870 NW2d 582 (2015) (quotation marks and citation omitted). When reviewing a claim of cruel or unusual punishment, we are to consider "(1) the severity of the sentence imposed compared to the gravity of the offense, (2) the penalty imposed for the offense compared to penalties imposed on other offenders in Michigan, (3) the penalty imposed for the offense in Michigan compared to the penalty imposed for the same offense in other states, and (4) whether the penalty imposed advances the penological goal of rehabilitation." *Stovall,* 510 Mich at 314.

In this case, defendant failed to demonstrate that his sentences are cruel or unusual. Defendant argues only that the severity of the penalty imposed is cruel or unusual punishment when compared to the gravity of the offense and that he will be at least 76 years old when his minimum sentence is served. However, "[a] sentence within the guidelines range is presumptively proportionate, and a proportionate sentence is not cruel or unusual." *People v Bowling*, 299 Mich App 552, 558; 830 NW2d 800 (2013). Defendant does not demonstrate that his sentences are cruel or unusual in comparison to penalties imposed for other crimes in this state or for the same crimes in other states. On the contrary, defendant's minimum sentences are presumptively proportional because they fall within the sentencing guidelines, and defendant did not rebut that presumption. See *Posey*, 512 Mich at 360. Given the gravity of the offenses, the potential danger that he poses to society, and his lengthy criminal record that subjected him to fourth-offense habitual offender status, defendant failed to rebut the presumption of proportionality and has failed to demonstrate that his sentences constitute either cruel or unusual punishment.

Affirmed.

/s/ Michael F. Gadola
/s/ Christopher M. Murray
/s/ Christopher P. Yates